R. Scott Thompson
David Leit
Matthew Savare
**LOWENSTEIN SANDLER LLP**
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALLY DELOREAN as administratrix for THE ESTATE OF JOHN Z. DELOREAN, <br><br> Plaintiff, <br><br> v. <br><br> DELOREAN MOTOR COMPANY (TEXAS), <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT** |

Plaintiff Sally DeLorean, as administratrix for the Estate of John Z. DeLorean (together, the "Estate") by and through its counsel, Lowenstein Sandler LLP, by way of Complaint against Defendant DeLorean Motor Company (Texas) ("DMC-TX"), alleges and avers as follows:

**PRELIMINARY STATEMENT**

1. John Z. DeLorean was a famous American businessman and engineer, whose work, lifestyle, and distinctive automobile designs are to this day symbols of American life in the second half of the 20th century. Mr. DeLorean founded the DeLorean Motor Company ("DMC"), which produced the iconic DMC 12 sports car, commonly known as "The DeLorean." DMC created and owned the trademarks used by DMC, including the company name "DeLorean Motor Company," the "DMC" brand and associated logo, "DMC 12," (the official name of the car produced by DMC) and "The DeLorean" (the common name used for DMC 12). As used in this Complaint, the term "DMC Marks" refers to all of the foregoing trademarks, and any other trademarks formerly owned by DMC. DMC also created the distinctive, non-functional design and image of the unique DMC 12 sports car (the "DMC 12 Trade Dress").

2. Throughout his life, Mr. DeLorean's name, image, likeness, biographical image and other indicia of his identity (the "DeLorean Identity") achieved great renown throughout the business world and popular culture, due to his unique designs and success as a "maverick" auto executive.

3. When DMC filed for bankruptcy protection in 1982, Mr. DeLorean personally acquired all of DMC's intellectual property, including the DMC Marks and the DMC 12 Trade Dress.

4. DMC-TX designs, markets and sells various items under DMC Marks and DMC 12 Trade Dress, and makes extensive use of the DeLorean Identity. DMC-TX holds itself out to the public as the "DeLorean Motor Company," using the exact same logo formerly used by DMC. DMC-TX even purports to license the use of the DMC Marks and DMC 12 Trade Dress to third parties. DMC-TX recently announced plans to build and sell an electric replica of the DMC 12. DMC-TX knows that it does not have the right to engage in these activities. Indeed, shortly before Mr. DeLorean's death,

DMC-TX acknowledged *in writing* that it had no right to use any intellectual property relating to Mr. DeLorean, DMC, or the DMC 12.

5. The Estate brings this action because DMC-TX has improperly and illegally appropriated for its own use Mr. DeLorean's legacy, including the DeLorean Identity, together with intellectual property such as the DMC Marks and DMC 12 Trade Dress, all of which belong to the Estate. The Estate seeks (1) injunctive relief prohibiting DMC-TX from further unauthorized use of property and rights belonging to the Estate, (2) an accounting by DMC-TX of all revenues received by DMC-TX through the unauthorized use of the DMC Marks, DMC 12 Trade Dress and DeLorean Identity, and (3) damages.

## THE PARTIES

6. Mr. DeLorean died on March 19, 2005. His Estate is subject to administration in the courts of Morris County, New Jersey. Sally DeLorean is the administratrix of the Estate, with an address of Post Office Box 3, Far Hills, New Jersey.

7. Upon information and belief, defendant DMC-TX is a corporation organized and existing under the laws of the State of Texas, with its principal place of business at 15023 Eddie Drive, Humble, Texas. DMC-TX is transacting and doing business within this judicial district, is committing the acts complained of herein within this judicial district, and is subject to the jurisdiction of this Court pursuant to the laws of the State of New Jersey and Rule 4 of the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. § 1121, in that the subject matter of this dispute arises under the federal Lanham Act and involves trademarks and unfair competition.

9.  This Court has supplemental jurisdiction over the state common law cause of action asserted hereunder pursuant to 28 U.S.C. § 1337.

10. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), because there is a complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum of $75,000. Specifically, the Estate is domiciled in New Jersey, and DMC-TX is a Texas company with its principal place of business in Texas.

11. This Court has personal jurisdiction over DMC-TX because it regularly conducts business in the State of New Jersey.

12. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the Estate's claims occurred in this District.

## FACTUAL BACKGROUND

13. John Z. DeLorean was born into extremely modest circumstances in Detroit in 1925. He loved cars from the time he was a child, and pursued an education as an engineer in order to enter the automotive industry that he loved. He began his career as an engineer for Chrysler, then for Packard, and then for General Motors. By the time he was 36 years old, he had become the chief engineer of GM's Pontiac division, and at the age of 42, became the youngest person ever to head a GM division.

14. In 1964, Pontiac introduced the DeLorean-engineered GTO, lauded as the first "muscle car." In 1967, Pontiac debuted another iconic DeLorean car, the Firebird. By this time, Mr. DeLorean was a star at General Motors, and by the time he was 44, he was put in charge of GM's Chevrolet division.

15. Mr. DeLorean was a poster child for success in America in the 1960's and 70's. He was photogenic, and dressed with style and flair, upsetting the staid corporate

culture of GM. He became famous for his impatience with GM's corporate culture, as well as for his playboy lifestyle. He represented the corporate side of the social revolution that swept America in the 1960's and 70's, publicly refusing to abide by the conservative rules of GM. His high-profile, hip persona made him a uniquely attractive spokesman for GM. He toured the world, promoting GM with charismatic style and flair.

16. Ultimately, however, he felt too constrained by GM's corporate culture and left to found the DeLorean Motor Company ("DMC") in 1973. It was at DMC that Mr. DeLorean created his most iconic car, the DMC 12, which became commonly known to the public as "The DeLorean."

17. The highly stylized DMC 12 was the embodiment of Mr. DeLorean's public image and vision of automotive design. Mr. DeLorean envisioned the DMC 12 as a sports car with revolutionary features and style - it reflected his personal vision of automobiles as functional works of art. The futuristic design of the DMC 12 made it immediately recognizable, and it remains unique and instantly recognizable to this day. It combined a number of artistic design features, such as gull-wing doors, a fiberglass underbody, unpainted stainless steel panels, distinctive taillights, and the highly-stylized "DMC" emblem in front and back, all of which gave the car a space-age look and feel. The finished product fulfilled Mr. DeLorean's concept of the car as a work of art.

18. Adding to the car's historical significance was the fact that it was engineered by the engineers responsible for the design and manufacture of the Lotus line of race cars. Thus, in addition to its distinctive design features, it incorporated many engineering features found in Lotus-manufactured automobiles.

19. DMC built about 9,000 DMC 12s before the company ran into financial problems and declared bankruptcy in 1982. Its assets were ultimately sold. Mr. DeLorean himself purchased all of the company's intellectual property, including the rights to use the DMC 12 Trade Dress and the DMC Marks, as well as all other design and engineering rights that had belonged to DMC.

20. Mr. DeLorean made a number of commercial uses of the DMC Marks and DMC Trade Dress in the 1990s and the early 2000s.

21. In December 2004, Steven Wynne, the "President" of DMC-TX, sought Mr. DeLorean's permission to modify a user's manual for the DMC 12. At that time, DMC-TX was a small club for owners of DMC 12s. DMC-TX provided a forum where DMC 12 owners could buy or trade parts and information for their DMC 12s.

22. When he contacted Mr. DeLorean, Mr. Wynne acknowledged that Mr. DeLorean had copyrights and other rights in the manual. Mr. DeLorean agreed to allow DMC-TX to make limited edits to the manual, but only after securing Mr. Wynne's express, written acknowledgement that Mr. DeLorean was the owner of all of the intellectual property (which included trademarks, designs, names, corporate identification and the like) that had belonged to DMC. Prior to Mr. DeLorean's death, DMC-TX made no attempt to license the DeLorean Identity, DMC Marks or DMC Trade Dress to third parties.

23. At no time did DMC-TX purchase or license the right to use the DeLorean Identity, DMC Marks or DMC Trade Dress from Mr. DeLorean, the Estate, or the DMC estate.

24. After Mr. DeLorean's death, DMC-TX began actively promoting a number of commercial uses of the DeLorean Identity, DMC Marks and DMC Trade Dress that, before Mr. DeLorean's death, it had conceded belonged to Mr. DeLorean.

25. Within the last two years, DMC-TX has designed and offered for sale items carrying the DeLorean name and/or reflecting DMC 12 Trade Dress. These items include what DMC-TX calls a "DeLorean Hat," a "DeLorean Pen," "DeLorean Luggage," a "DeLorean Notebook," and a "DeLorean Keychain." All of these items are advertised for sale on the website of DMC-TX. The use of the DeLorean Identity, DMC Marks and DMC Trade Dress in connection with the sale of these knick-knacks

trivializes Mr. DeLorean's life and work, diminishes his legacy, and diminishes the value of the DeLorean Identity, DMC Marks and DMC Trade Dress.

26. DMC-TX has misappropriated the web address "www.delorean.com." The home page of the website of DMC-TX displays the uniquely styled "DMC" devised by Mr. DeLorean as the symbol and trademark of DMC, and features the name "DeLorean Motor Company" with nothing to distinguish the current company (DMC-TX) from the actual DMC.

27. On the website, DMC-TX has a page devoted to its business of licensing the DeLorean name and images of the DMC 12. DMC-TX makes it appear that it has licensed the use of the name DeLorean or images of the DMC 12 or related images to such companies as Nike, Mattel, Microsoft, Urban Outfitters, and Apple, among others. Pictures of Nike's "DeLorean Nike Dunk" basketball shoe appear on the website; DMC-TX apparently sold Nike a license to use the name "DeLorean" and a futuristic design based upon the design of the DMC 12 (including a tread that echoes the design of the DMC 12's taillights).

28. Also on its website, DMC-TX uses the image of Mr. DeLorean in a number of places. One place where Mr. DeLorean's picture appears prominently is in a portion of the website promoting "Mobile and Desktop Wallpapers" for the computer.

29. In October 2011, DMC-TX announced plans to design and manufacture an electric version of the DMC 12. The picture that accompanied this announcement makes it clear that DMC-TX intends to copy the design of the DMC-12 and to keep the design as close as possible to the DMC 12.

30. The two men behind DMC-TX -- Steven Wynne and James Espey -- hold themselves out as the owners of Mr. DeLorean's identity and legacy, and make no effort to distinguish their company from the real DMC. Throughout the DMC-TX website, they intimate that they have the right to use Mr. DeLorean's life story in connection with their business. Carrying this misrepresentation to the extreme, they established what they call

"The DeLorean Museum," a website at www.deloreanmuseum.org. The Estate was never consulted about the establishment of the so-called DeLorean Museum. The website appears to be simply another way for Messrs. Wynne and Espey to sell "DeLorean" themed and tagged merchandise at the website's "Store" page.

31.  DMC-TX has never sought or obtained permission from the Estate for any of these activities. On the contrary, when contacted in December 2013 to discuss these issues, DMC-TX ignored the Estate's representatives.

## COUNT ONE

### Lanham Act, 15 U.S.C. §1125(a)(1)(A)

32.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 31 above as if separately set forth herein.

33.  The DMC 12 Trade Dress is non-functional, distinctive, has acquired secondary meaning, and therefore constitutes protectable trade dress that belongs to the Estate. There is strong goodwill associated with the DMC 12 Trade Dress.

34.  There is also strong goodwill associated with the DMC Marks.

35.  DMC-TX falsely holds itself out as the owner of the right to build and distribute the DMC 12 and use the DMC Marks and DMC 12 Trade Dress. It does this without the approval of the Estate or any other entity authorized to give such approval.

36.  DMC-TX falsely expressly claims to have "exclusive distribution rights" to the DMC 12, as well as the right to use the DMC Marks and DMC 12 Trade Dress, claims that are not based upon ownership of any legal right.

37.  Defendant's unlawful, unauthorized, and unlicensed production of replica DMC 12s, and its use of the DMC Marks and DMC 12 Trade Dress, is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of DMC-TX with DMC, Mr. DeLorean, and/or the Estate.

38. Defendant's unlawful, unauthorized, and unlicensed production of replica DMC-12s, and its use of the DMC Marks and DMC 12 Trade Dress, is likely to cause confusion, or to cause mistake, or to deceive the public as to the origin, sponsorship, or approval of DMC-TX's goods, services, or commercial activities by DMC, Mr. DeLorean, and/or the Estate.

39. The foregoing actions violate 15 U.S.C. § 1125(a)(1)(A).

40. Plaintiff has no adequate remedy at law and, if Defendant's activities are not enjoined, Plaintiff will continue to suffer injury.

41. Plaintiff has suffered economic damages as a result of the foregoing actions.

## COUNT TWO

### Lanham Act, 15 U.S.C. §1125(a)(1)(B)

42. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 41 above as if separately set forth herein.

43. DMC-TX's actions are deliberately designed to create a false impression that it is the legitimate owner of the DMC 12 Trade Dress and DMC Marks, and is the legitimate and authorized successor to DMC.

44. DMC-TX's commercial advertising and promotion using the DMC Marks and DMC 12 Trade Dress misrepresents the nature, characteristics, qualities, or geographic origin of DMC-TX's goods, services, or commercial activities, by suggesting a false association with DMC, Mr. DeLorean and/or the Estate.

45. The foregoing actions violate 15 U.S.C. § 1125(a)(1)(B).

46. Plaintiff has no adequate remedy at law and, if Defendant's activities are not enjoined, Plaintiff will continue to suffer injury.

47. Plaintiff has suffered economic damages as a result of the foregoing actions.

## COUNT THREE

### Lanham Act, 15 U.S.C. §1125(c)

48. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 47 above as if separately set forth herein.

49. The DMC Marks and DMC 12 Trade Dress are widely recognized by the general consuming public of the United States as a designation of DMC and Mr. DeLorean as the source of the DMC 12 and related images and property.

50. The DMC Marks and DMC 12 Trade Dress are famous within the meaning of 15 U.S.C. § 1125(c)(2)(A).

51. Plaintiff's infringement and use of the DMC Marks and DMC 12 Trade Dress impairs the distinctiveness of these marks as associated with DMC, Mr. DeLorean and/or the Estate.

52. Plaintiff's actions constitute dilution by blurring within the meaning of 15 U.S.C. § 1125(c)(2)(B).

53. Plaintiff's infringement and use of the DMC Marks and DMC 12 Trade Dress harms the reputation of these marks as associated with DMC, Mr. DeLorean and the Estate.

54. Plaintiff's infringement and use of the DMC Marks and DMC 12 Trade Dress amount to dilution by tarnishment within the meaning of 15 U.S.C. § 1125(c)(2)(C).

55. Plaintiff has no adequate remedy at law and, if Defendant's activities are not enjoined, Plaintiff will continue to suffer injury to the goodwill and reputation of Mr. DeLorean and the DMC-12.

56. Plaintiff has suffered economic damages as a result of the foregoing actions.

## COUNT FOUR

### Violation of Mr. DeLorean's Rights of Publicity

57. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 56 above as if separately set forth herein.

58. Defendant has used, and continues to use the DeLorean Identity for advertising and commercial purposes and/or for the purpose of trade in connection with the sale of products bearing or based upon the DeLorean Identity.

59. Neither Mr. DeLorean nor, after his death, the Estate has consented to such uses.

60. Defendant unauthorized use is willful, and it has refused to cease its use of the DeLorean Identity even after receiving explicit demands that such use cease.

61. Defendant's conduct violates Mr. DeLorean's rights of publicity in and to the DeLorean Identity, which now belongs to the Estate.

62. Plaintiff has suffered economic damages as a result of the foregoing actions.

63. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

(i) That Plaintiff be awarded compensatory and punitive damages in an amount to be determined at trial for Defendant's wrongful use and infringement of the DMC Marks, DMC 12 Trade Dress, and DeLorean Identity, as well as all other designs, images, and other intellectual property belonging to the Estate;

(ii) That Defendant, its officers, directors, employees, and all those acting for Defendant or on its behalf, be enjoined and restrained from any further unauthorized use

of the DMC Marks and DMC-12 Trade Dress, and any other words, terms, names symbols, or devices confusingly similar thereto;

(iii)   That Defendant, its officers, directors, employees, and all those acting for Defendant or on its behalf, be enjoined and restrained from any further unauthorized use of the DeLorean Identity;

(iv)   That Defendant, its officers, directors, employees, and all those acting for Defendant or on its behalf, be enjoined and restrained from offering to license to third parties the DMC Marks, DMC 12 Trade Dress and/or DeLorean Identity, in any way, shape, or form, and that they be restrained and enjoined from engaging in any conduct designed, or that has the likelihood, to create the impression in third parties that they have authorization to commercially exploit the DMC Marks, DMC-12 Trade Dress, and/or DeLorean Identity, or any component part thereof;

(v)   That Defendant account for and pay over to Plaintiffs all profits realized by Defendant as a result of Defendant's unauthorized use of the DMC Marks, DMC 12 Trade Dress, DeLorean Identity, and any other rights owned by the Estate, whether earned directly or through indirect means such as licensing; and

(vi)   That Defendant pay to Plaintiff punitive damages and attorneys' fees incurred in the prosecution of this action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial of all issues so triable.

Respectfully submitted,

LOWENSTEIN SANDLER LLP
*Attorneys for Plaintiff*

By: _____
R. Scott Thompson

Dated: February 21, 2014